**2009 BNH 014**       Note:  This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | Bk. No. 04-14151-JMD and |
| | Bk. No. 04-14152-JMD |
| | |
| Robotic Vision Systems, Inc., and | Jointly Administered |
| Auto Image ID, Inc., | Chapter 7 |
|         Debtors | |
| | |
| Steven M. Notinger, | |
| Chapter 7 Trustee, | |
|         Plaintiff | |
| | |
| v. | Adv. No. 06-1157-JMD |
| | |
| Dreier LLP, | |
|         Defendant | |
| | |
| Steven M. Notinger, | |
| Chapter 7 Trustee, | |
|         Plaintiff | |
| | |
| v. | Adv. No. 06-1158-JMD |
| | |
| Marotta, Gund, Budd & Dzera, LLC, | |
|         Defendant | |

*Steven M. Notinger, Esq.*
*Donchess & Notinger, P.C.*
*Nashua, New Hampshire*
*Chapter 7 Trustee/Plaintiff*

*Norman N. Kinel, Esq.*
*Ira Sacks, Esq.*
*Terence Watson, Esq.*
*Timothy Solomon, Esq.*
*Dreier LLP*
*New York, New York*
*Former Attorneys for the Debtors and*
*Attorneys for Dreier LLP*

*James W. Donchess, Esq.*
*Donchess & Notinger, P.C.*
*Nashua, New Hampshire*
*Attorney for Chapter 7 Trustee/Plaintiff*

*Michael D. Sirota, Esq.*
*Ilana Volkov, Esq.*
*Cole, Schotz, Meisel, Forman & Leonard, P.A.*
*Hackensack, New Jersey*
*Attorney for Marotta, Gund, Budd & Dzera, LLC*

*John M. Sullivan, Esq.*
*Preti Flaherty, PLLP*
*Concord, New Hampshire*
*Attorney for Marotta, Gund, Budd & Dzera, LLC*

*Thomas J. Pappas, Esq.*
*Wiggin & Nourie, P.A.*
*Manchester, New Hampshire*
*Former Attorney for Pat V. Costa*

*Geraldine Karonis, Esq.*
*Office of United States Trustee*
*Manchester, New Hampshire*
*Attorney for United States Trustee*

*Charles A. Dale III, Esq.*
*Daniel J. Kelly, Esq.*
*David Himelfarb, Esq.*
*McCarter & English, LLP*
*Boston, Massachusetts*
*Former Attorneys for Pat V. Costa*

## MEMORANDUM OPINION

## I. INTRODUCTION AND PROCEDURAL HISTORY

On November 19, 2004, Robotic Vision Systems, Inc. and Auto Image ID, Inc. (collectively the "Debtors") sought bankruptcy protection under chapter 11 of the Bankruptcy Code. On October 11, 2005, the Court converted the Debtors' jointly administered cases to chapter 7, and the United States Trustee (the "UST") appointed Steven M. Notinger (the "Trustee") to serve as trustee. Upon conversion of the Debtors' cases to chapter 7, the Court set November 15, 2005, as the bar date for filing final applications for fees and expenses for chapter 11 professionals (Bk. Doc. No. 1462). Accordingly, the Debtors' former attorneys, Dreier LLP ("Dreier"), and the Debtors' crisis manager, Marotta, Gund, Budd & Dzera, LLC ("MGBD"), among others, filed final fee applications (Bk. Doc. Nos. 1502 and 1503). In addition, MGBD filed a motion for allowance of an administrative expense claim in accordance with the terms of its amended management agreement (Bk. Doc. No. 1498).

Dreier sought final approval of chapter 11 fees in the amount of $3,009,678.55 and chapter 11 expenses in the amount of $193,540.49 (Adv. No. 06-1157-JMD Doc. No. 2 and Bk. Doc. No. 1502) (the "Dreier Application"). Pat V. Costa ("Costa") objected to the Dreier

Application on the grounds that (1) Dreier's services harmed the Debtors' estates; (2) Dreier committed misconduct, malpractice, and fraud; and (3) certain activities were not beneficial to the Debtors' estates (Adv. No. 06-1157-JMD Doc. No. 1 and Bk. Doc. No. 1610). The UST also objected to the Dreier Application (Bk. Doc. No. 1624).[1]

The Trustee did not file any objection to the Dreier Application. Instead, he filed a motion to approve a settlement agreement with Dreier (Adv. No. 06-1157-JMD Doc. No. 4 and Bk. Doc. No. 1654) (the "Dreier Settlement"). The recommendation, if followed, and the Dreier Settlement, if approved, would result in a reduction of fees. Specifically, Dreier agreed to voluntarily reduce its fee and expense request by $450,000.00, and the parties agreed to execute mutual releases (Adv. No. 06-1157-JMD Adv. Doc. No. 4 and Bk. Doc. No. 1654). The Trustee recommended that the Court adopt the terms of the Dreier Settlement when ruling on the Dreier Application.

MGBD filed an application seeking final approval of chapter 11 fees in the amount of $1,706,451.00 and chapter 11 expenses in the amount of $164,026.56 (Adv. No. 06-1158-JMD Doc. No. 2 and Bk. Doc. No. 1503) (the "MGBD Application"). In addition, MGBD filed a motion seeking allowance of an administrative expense claim of $390,115.43 (Adv. No. 06-1158-JMD Doc. No. 3 and Bk. Doc. No. 1498) (the "MGBD Administrative Claim"). Costa objected to the MGBD Application on the grounds that (1) MGBD's services harmed the

---

[1] The UST's objection raised such issues as duplicate entries, excessive hourly rates and billing, inappropriate expenses, and failure to provide documentation. The UST also argued that many of the fees were difficult to justify based on the results achieved in these cases. In addition, given the estates' apparent administrative insolvency, the UST suggested it was premature to make any rulings until all chapter 7 and 11 administrative expenses were known. Lastly, she argued that the issues raised by Costa in his objections to the fee applications should be addressed first so that the full merits of the professionals' services could be properly assessed. Since filing her objection to the Dreier Fee Application, the UST filed on July 18, 2006, a consent to the Trustee's settlement outlined below.

Debtors' estates; (2) MGBD committed misconduct, malpractice, and fraud; (3) certain activities were not beneficial to the Debtors' estates; and (4) MGBD had undisclosed and impermissible conflicts of interest (Adv. No. 06-1158-JMD Doc. No. 1 and Bk. Doc. No. 1608).  The UST also objected to the MGBD Application as well as the MGBD Administrative Claim (Bk. Doc. No. 1629).[2]

The Trustee did not file any objection to the MGBD Application.  Rather, he filed a motion to approve a settlement agreement with MGBD (Adv. No. 06-1158-JMD Doc. No. 5 and Bk. Doc. No. 1650) (the "MGBD Settlement").  The recommendation, if followed, and the MGBD Settlement, if approved, would result in a reduction of fees.  Specifically, MGBD agreed to pay the estate $10,000.00 upon final approval of the MGBD Application, MGBD agreed to waive the MGBD Administrative Claim totaling $390,115.43, and the parties agreed to execute mutual releases (Adv. No. 06-1158-JMD Doc. No. 5 and Bk. Doc. No. 1650).  The Trustee recommended that the Court adopt the terms of the MGBD Settlement when ruling on the MGBD Application and the MGBD Administrative Claim.

The Court held a procedural status hearing on the various fee applications and objections on May 5, 2006, and took some matters under advisement to determine the appropriate procedures for considering and ruling on the applications, objections, recommendations, and settlements.  After considering the pleadings, the argument of counsel, and relevant case law, the Court concluded that the objections to the Dreier and MGBD Applications filed by Costa and the UST should be converted into adversary proceedings.[3]

---

[2]  The UST's objection to the MGBD Application was similar to her objection to the Dreier Application.  The UST also filed a consent to the Trustee's settlement on July 18, 2006.

[3]  In an unpublished decision, the Court of Appeals for the First Circuit affirmed the Court's decision that Costa could not intervene in the adversary proceeding involving MGBD under Fed. R.

On May 26, 2006, the Court instituted two separate proceedings (Adv. Nos. 06-1157-JMD and 06-1158-JMD).  The Court designated the Trustee as plaintiff in both proceedings and Dreier and MGBD as defendants in each respective proceeding.  In converting the objections to adversary proceedings, the Court indicated that it had an independent duty to determine the reasonableness of professionals' fee awards.  In re Southeast Banking Corp., 314 B.R. 250, 267-68 (Bankr. S.D. Fla. 2004); see Casco Northern Bank, N.A. v. DN Assocs. (In re DN Assocs.), 3 F.3d 512, 514 (1st Cir. 1993).

In order to determine if the settlements proposed by the Trustee are fair and reasonable under the circumstances, the Court is required to apprise itself of the merits of Dreier's and MGBD's requests for fees.  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); Ars Brook, LLC v. Jalbert (In re Servisense.com, Inc.), 382 F.3d 68, 72 (1st Cir. 2004).  As indicated in prior orders, the determination of whether a settlement of a fee award to a professional to a former debtor-in-possession is fair and reasonable is analytically inseparable from the Court's consideration of whether that professional is entitled to an award of fees and the amount.  Southeast Banking, 314 B.R. at 268.  "In order to determine whether the settlement is fair, the Court must first determine the amount of fees and expense reimbursement to which the [professional] may be entitled."  Id.  In the context of a final fee application, if the settlement falls above the highest point in the range of reasonableness for a fee award, it must not be approved.  Id. at 272.

The Court previously ruled that in approving a settlement the Court need not conduct a mini-trial on the merits of the dispute.  See id.  Rather, the Court's responsibility is to "form an

---

Bankr. P. 7024 and Fed. R. Civ. P. 24; the court expressed no opinion on the propriety of the Court's conversion of the objections into adversary proceedings.  Costa v. Marotta, Gund, Budd & Dzera, LLC, No. 07-1898, 2008 WL 2405024 (1st Cir. June 16, 2008) (per curiam).

educated estimate of the complexity, expense, and likely duration" of the litigation necessary to

resolve the dispute and "to compare the terms of the compromise with the likely rewards of

litigation." TMT Trailer Ferry, 390 U.S. at 424-25.  To apprise itself of the merits of the Dreier

and MGBD Applications and to determine if the settlements proposed by the Trustee are fair and

reasonable under the circumstances, the Court conducted a multi-day hearing on December 4 and

5, 2006, and on January 29, 2007, at which more than 150 exhibits and the live testimony of the

Trustee were admitted into evidence.[4]  At the conclusion of the hearing, the parties were given

an opportunity to file written closing arguments, the last of which was filed with the Court on

May 14, 2007.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§

1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States

Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.).

This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  THE APPLICATIONS

The issue before the Court is the advisability of the Dreier Settlement and the MGBD

Settlement and the basis for the Trustee's decision to settle the issues raised by Costa and by the

Trustee (although not in any formal pleading), concerning the Dreier Application, the MGBD

Application, and the MGBD Administrative Claim.

> In deciding whether to approve a compromise of a lawsuit, the specific factors a
> bankruptcy court should consider include: "(i) the probability of success in the
> litigation being compromised; (ii) the difficulties, if any, to be encountered in the
> matter of collection; (iii) the complexity of the litigation involved, and the

---

[4]  The Court also admitted into evidence excerpts of the video depositions of Kenneth Eckstein
taken September 22, 2005, and Robert Schmidt taken September 9 and 27, 2005.

expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise." The court's consideration of these factors should demonstrate whether the compromise is fair and equitable, and whether the claim the debtor is giving up is outweighed by the advantage to the debtor's estate.

Servisense.com, 382 F.3d at 72 (quoting Jeremiah v. Richardson, 148 F.3d 17, 23 (1st Cir. 1998)).  To determine if the proposed settlements are advisable, the Court is required to apprise itself of the merits of Dreier's and MGBD's requests for fees and determine whether Dreier and MGBD are entitled to an award of fees and, if so, in what range or amount.  Accordingly, a brief review of the final fee applications themselves and the positions of the parties is appropriate.

**A.  Dreier Application**

**1.  The Request**

Dreier represented the Debtors as general counsel from November 19, 2004, the date the Debtors filed chapter 11 bankruptcy, until October 11, 2005, the date the Court converted the Debtors' cases to chapter 7.  During this period, Dreier performed 7,583.45 hours of service, at an average hourly rate of $396.87, for total fees of $3,009,678.55.  During this period, Dreier also incurred expenses totaling $193,540.49.  Dreier's request for fees is divided into the following categories:

| Category | Hours | Fee Amount |
|---|---:|---:|
| General Chapter 11 Administration | 251.4 | $95,837.50 |
| Business Operations | 190.6 | 85,498.50 |
| Claims Issues/Claims Objections | 39.6 | 19,401.00 |
| Meetings of Creditors | 30.4 | 17,504.00 |
| Executory Contracts/Unexpired Leases | 34.6 | 17,905.00 |
| Asset Sales/Dispositions | 2,532.75 | 1,019,572.25 |
| Bankruptcy Court Litigation | 2,664.8 | 1,025,624.25 |

| | | |
|---|---|---|
| Relief from Stay Proceedings | 86.9 | 36,157.00 |
| Schedules/Monthly Reports | 12.5 | 5,215.00 |
| Retention/Disclosure Issues | 199.2 | 93,051.00 |
| Employment/Fee Application Review/Objections | 40.5 | 16,249.00 |
| Prep of Fee Statement/Fee Apps/Fee Hearings | 299.4 | 74,933.50 |
| Employee Retention/Benefits/Pension Issues | 179.8 | 75,416.50 |
| Exclusivity/Plan/Disclosure Statement/ Confirmation | 179.0 | 80,812.50 |
| DIP Financing/Cash Collateral/Financing | 579.4 | 270,935.50 |
| SEC Compliance/Tax Issues | 36.4 | 19,927.00 |
| Travel | 226.2 | 55,639.05 |
| Total | 7,583.45 | $3,009,678.55 |

Dreier's request for expenses consists of the following:

| Category | Amount |
|---|---|
| Airfare | $22,958.95 |
| Car Service | 22,455.12 |
| Delivery Service | 108.75 |
| Facsimile | 252.90 |
| Federal Express/Overnight Mail | 2,640.79 |
| Filing Fees | 1,925.21 |
| Hotel Expense | 9,422.18 |
| Long Distance Service and Conference Calls, including Telephonic Appearances | 6,803.74 |
| Meals Expense | 8,918.01 |
| Outside Copy Service | 7,729.48 |
| Secretarial Service/Overtime-Support Staff | 285.94 |

| Photocopies | 749.00 |
|---|---|
| Postage | 217.41 |
| Transcripts | 18,177.90 |
| Electronic Research (Westlaw) | 90,895.11 |
| Total | $193,540.49 |

## 2. The Dreier Settlement

The Trustee seeks approval of a settlement agreement he entered into with Dreier regarding the Dreier Application.  In summary, the Dreier Settlement includes the following general terms and conditions:

a.    The Trustee agrees to and recommends to the Court that Dreier be awarded final fees of $2,559,678.55 and final expenses of $102,392.48.  The Trustee takes no position with respect to Dreier's request for reimbursement of electronic expenses totaling $91,148.01.  Dreier agrees to accept that amount in fees and expenses, provided that the Court approves (i) the amount of its final fee claim and (ii) the settlement agreement.

b.    The Trustee shall not object to or support or cooperate in any objection to the final fee claim.  The Trustee also shall use his best efforts to obtain the United States Trustee's support of the Dreier Settlement.[5]

c.    Except for the right to enforce the terms of the settlement agreement and to require that all of its terms have been properly and fully complied with by all parties, (i) the Trustee, on behalf of the chapter 11 and 7 estates of the Debtors, and the Debtors will release Dreier with respect to any claims the Trustee and/or the Debtors have or could have against them from the beginning of time through the date of the settlement agreement, and (ii) Dreier will release the Trustee and/or the Debtors from any claims they have or could have against them, from the beginning of time through the date of the settlement agreement.

d.    The settlement agreement is contingent on the Court's approval of its terms.

e.    Upon entry of an order approving the settlement, Dreier shall be permitted to immediately release the carve-out funds being held in Dreier's trust account and pay itself the full amount of the carve-out funds in reduction of the amounts owed under the final fee award.  The amount remaining plus whatever award the Court

---

[5]  As noted previously, the UST consents to the Dreier Settlement.

9

makes in connection with the request for reimbursement of electronic research expenses shall constitute an allowed chapter 11 administrative expense claim against the Debtors' estates and shall be paid pro rata as and when distributions are made to other chapter 11 administrative claimants of the same priority, unless otherwise agreed to by the parties.

f.      The parties agree to suspend all proceedings as against each other pending a court order on the settlement.

g.      The parties agree that their willingness to enter into the settlement agreement is not, nor is it to be deemed or construed as, an admission of legal liability or wrongdoing of any kind on the part of any party.

**B. MGBD Application**

**1. The Request**

MGBD was retained by the Debtors to serve as its crisis manager and did so pursuant to the Restated Management Agreement dated November 19, 2004 (the "Initial MGBD Agreement") and the Amended and Restated Management Agreement dated January 20, 2005 (the "Amended MGBD Agreement").  Under the Initial MGBD Agreement, upon the submission of invoices to the Debtors, MGBD was to be paid $100,000.00 plus expenses for the first month of services and then $150,000.00 plus expenses for each subsequent month of services.  The Amended MGBD Agreement provided that, upon the submission of invoices to the Debtors, MGBD would be paid monthly fees of $200,000.00 plus expenses for services, effective January 20, 2005.  MGBD voluntarily reduced its monthly fees to $150,000.00 plus expenses for services, effective March 24, 2005, to reflect a reduced workload after sale of the Semiconductor Equipment Group ("SEG") division.  Payment to MGBD under both agreements was not conditioned upon any particular results to be achieved by MGBD and was subject only to final approval by the Court upon conclusion of MGBD's engagement.  MGBD's services ceased after conversion of the Debtors' cases to chapter 7 on October 11, 2005.  In accordance with the terms of the Initial and Amended MGBD Agreements, MGBD seeks final approval of $1,706,451.00 in

fees.  In addition to these fees, MGBD seeks approval of $164,026.56 in expenses incurred in connection with its services under the Initial and Amended MGBD Agreements during the period from November 2004 to October 2005.  A breakdown of expenses has not been provided to the Court.

In addition to requesting final approval of fees and expenses as described above, MGBD also filed a motion seeking approval of an administrative expense claim in the amount of $390,115.43 for attorneys' fees and costs and other out-of-pocket expenses that MGBD incurred in connection with Costa's motion for appointment of a chapter 11 trustee and other related matters.  MGBD cites entitlement to the MGBD Administrative Claim under section 7(b) of the Amended MGBD Agreement, which contained a broad indemnification provision.

## 2.  The MGBD Settlement

The Trustee seeks approval of a settlement agreement he entered into with MGBD regarding the MGBD Application and the MGBD Administrative Claim.  In summary, the MGBD Settlement includes the following general terms and conditions:

a.      The Trustee agrees to and recommends to the Court that MGBD be awarded final fees of $1,706,451.00 and final expenses of $164,026.56, except as provided below in paragraph b.  MGBD agrees to accept that amount in fees and expenses, to dismiss with prejudice the MGBD Administrative Claim in the amount of $390,115.43, and to assert no further indemnity claims against the Debtors' estates, provided that the Court approves (i) the amount of its final fee claim and (ii) the settlement agreement.

b.      Upon entry of a final, non-appealable order approving MGBD's final fee claim and the settlement agreement, MGBD shall pay the Trustee, for the benefit of the Debtors' estates, the sum of $10,000.00.

c.      The Trustee shall not object to or support or cooperate in any objection to the final fee claim.  The Trustee also shall use his best efforts to obtain the United States Trustee's support of the MGBD Settlement.[6]

---

[6]  As noted previously, the UST consents to the MGBD Settlement.

d.    Except for the right to enforce the terms of the settlement agreement and to require that all of its terms have been properly and fully complied with by all parties and subject to the withdrawal of the settlement as described in paragraph 5 of the settlement agreement, (i) the Trustee, on behalf of the chapter 11 and 7 estates of the Debtors, and the Debtors will release MGBD with respect to any claims the Trustee and/or the Debtors have or could have against them from the beginning of time through the date of the settlement agreement, and (ii) MGBD will release the Trustee and/or the Debtors from any claims they have or could have against them, from the beginning of time through the date of the settlement agreement.

e.    The settlement agreement is contingent on the Court's approval of its terms and MGBD not being requiring to expend more than $25,000.00 to assist in its effectuation.

f.    The parties agree to suspend all proceedings as against each other pending a court order on the settlement.

g.    The parties agree that their willingness to enter into the settlement agreement is not, nor is to be deemed or construed as, an admission of legal liability or wrongdoing of any kind on the part of any party.

**C. Costa's Objection**

Costa objected to the Dreier and MGBD Applications on the grounds that (1) their services harmed the Debtors' estate; (2) they each committed misconduct, malpractice, and fraud; and (3) certain of their activities were not beneficial to the Debtors' estates. Costa's objections were based on a number of allegations against attorney Norman Kinel of Dreier ("Kinel") and Richard Budd of MGBD ("Budd"). Specifically, Costa alleged:

a.    At the time the Debtors were considering retention of MGBD, MGBD failed to disclose that it had a conflict of interest due to its involvement with Samuel Zell in a chapter 11 case in Indiana, In re American Commercial Lines, Bk. No. 03-90305-BHL (the "ACL Case").[7]

---

[7] Samuel Zell is a principal in RVSI Investors, LLC ("RVSI Investors"), the Debtors' prepetition and postpetition lender whose conduct Costa has characterized as "hostile, overly aggressive, and wholly improper."

b.    Budd and Kinel mislead Costa and the Debtors' board of directors regarding the availability of cash under the terms of the cash collateral agreement, and subsequent court order, with RVSI Investors.

c.    Budd misled the Debtors' board of directors regarding his support for retention of a new president for the Debtors, replacement bankruptcy counsel, and retention of a new financial advisor prior to his appointment as controlling person, because immediately after his appointment he failed to retain the new officer and advisors selected by the board.

d.    MGBD and Dreier mishandled the sale of the Debtors' Acuity CiMatrix ("ACIM") and SEG divisions by failing to address the claim of GSI Lumonics Inc. ("GSI Lumonics") in connection with the sale of the SEG division and failing to oppose the demands of the cash collateral lender by agreeing to an unreasonably short time frame for completion of both sales resulting in fire sale prices for the Debtors' two operating divisions.

e.    The Trustee's investigation of Costa's fraud and malpractice allegations against Dreier and MGBD was cursory and ignored "voluminous credible evidence" produced by Costa in support of his fraud and malpractice claims.

## III. DISCUSSION

### A. Standards Applicable to Consideration of the Fee Applications

Dreier and MGBD are entitled to "reasonable compensation for actual, necessary services" rendered to the Debtors and "reimbursement for actual, necessary expenses" incurred in connection with such services. 11 U.S.C. § 330(a). "It is well established in this circuit that a reasonable [attorney's] fee will first be computed in accordance with the 'lodestar' method, i.e. a reasonable hourly rate applied to reasonable hours expended in rendering the necessary services." In re Elmendorf Bd. Corp., 57 B.R. 580, 584 (Bankr. D.N.H. 1986) (citing Boston & Maine Corp. v. Moore, 776 F.2d 2 (1st Cir. 1985)); see also Lipsett v. Blanco, 975 F.2d 934 (1st Cir. 1992); Torres Lopez v. Consejo de Titulares del Condominio Carolina Court Apartments (In re Torres Lopez), BAP No. PR 08-068, 2009 WL 1259377, at *4 (B.A.P. 1st Cir. May 7, 2009). To determine a reasonable number of hours, the Court takes the party's submitted time and then

13

subtracts from that figure all hours which are duplicitive, unproductive, excessive or otherwise unnecessary.  Lipsett, 975 F.2d at 937.  The Court then applies hourly rates to each billed task "taking into account the 'prevailing rates in the community for comparably qualified attorneys.'" Id. (quoting United States v. Metro. Dist. Comm'n, 847 F.2d 12, 19 (1st Cir. 1988)); In re Pub. Serv. Co. of New Hampshire, 160 B.R. 404, 413 (Bankr. D.N.H. 1993) (hereinafter "PSNH") (citing Pennsylvania v. Delaware Valley Citizens' Council, 478 U.S. 546, 564 (1986)).  Once established, the lodestar test represents a presumptively reasonable fee.  Lipsett, 975 F.2d at 937. That fee may then be modified, upward or downward, based upon consideration of some or all of the twelve factors first announced in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974).  PSNH, 160 B.R. at 413.

As noted previously, in order to determine if the proposed settlements are advisable, the Court is required to apprise itself of the merits of Dreier's and MGBD's requests for fees and determine whether Dreier and MGBD are entitled to an award of fees and, if so, in what range or amount.  Accordingly, the Court shall, in turn, examine the Dreier and MGBD Applications regarding the details of the services performed and the compensation sought, Costa's allegations against each applicant, the merits of each application, and the Trustee's settlements.

### B.  Dreier Application

The average hourly rate in the Dreier Application is $396.87.  No one has objected to the rate charged by Dreier.  The Court finds that Dreier's average hourly rate is a reasonable hourly rate given the nature of these cases.  Dreier performed 7,583.45 hours of service during its involvement in the cases from November 19, 2004, the date the Debtors filed chapter 11 bankruptcy, until October 11, 2005, the date the Court converted the Debtors' cases to chapter 7. Costa has not objected to the reasonableness of the specific number of hours spent by Dreier in

14

performing services, but rather he argues that certain activities were not beneficial to the Debtors' estates, that Dreier's services actually harmed the Debtors' estate, and that Dreier committed misconduct, malpractice, and fraud and therefore should not be compensated for its services.

In determining whether Dreier spent a reasonable amount of time on necessary services during its employment, the Court must review the results achieved in these cases, i.e., were the Debtors' cases successful. During the chapter 11 phase of the Debtors' cases, the two operating divisions were sold as going concerns. In March 2005, the Court approved of the sale of the SEG division for $5.72 million (Bk. Doc. No. 803). In September 2005, the Court approved the sale of the ACIM division for $23 million, subject to certain adjustments (Bk. Doc. No. 1369). Through these sales, the Debtors received $28.72 million, less adjustments, which funds paid off substantial debt. As measured against the sales proceeds, Dreier's total requested fees of $3,009,678.55, or 10.5% of the going concern value of the Debtors, is not unreasonable.[8]

Costa argues that the divisions were sold below their market value. However, at the time the Debtors' cases were filed, problems already existed that were likely to interfere with the Debtors' attempts to obtain market value. At the commencement of their cases, the Debtors faced two major problems: (1) access to cash for operations; and (2) an ongoing dispute with GSI Lumonics. At the beginning of their cases, the Debtors' operations did not generate a positive cash flow, they had no availability remaining under their revolving loan with RVSI Investors, and their relationship with that lender was very contentious, if not hostile. It was apparent that the Debtors would be able to reorganize their business operations, whether through

_____

[8] The Court notes that amounts requested in Dreier's fee application are divisible into approximately three equal parts: (1) the sale of the Debtors' operating divisions; (2) litigation with Costa; and (3) general bankruptcy administration.

a sale, new investment, or internally, only if they could find new debtor-in-possession financing or strike a deal with their existing lender, RVSI Investors.  RVSI Investors had lost confidence in the Debtors' management and demanded that the Debtors quickly sell the SEG division and impose restrictions on Costa's management of the Debtors.  After some resistance, the Debtors ultimately entered into a consensual cash collateral arrangement with RVSI Investors under which it could continue to operate through over-advances under the borrowing formula while conducting a quick sale of the SEG division.[9]

### 1. Alleged Malpractice by Dreier

The malpractice allegations involve two main issues.  First, Costa alleges that Dreier misrepresented or failed to understand the cash that would be available under the cash collateral agreements which it negotiated with RVSI Investors on behalf of the Debtors.  Second, Dreier committed malpractice by failing to resolve the dispute with GSI Lumonics prior to the sale of the SEG division.

In connection with the availability of cash under the cash collateral agreement with RVSI Investors, both Budd and Kinel advised Costa before entry of an order on cash collateral that, although they and Costa may have thought that $2 million in new money would available to the Debtors, such was not the case.  See Ex. 19 and 119.  Despite this advice, and after negotiating all night, the Debtors agreed to the terms of a cash collateral order with RVSI Investors.  See Tr. of Nov. 24, 2004 Hr'g (Bk. Doc. No. 230).  The parties agreed to a form of order, which the Court entered on November 24, 2004 (Bk. Doc. No. 46).

_____

[9] A more detailed discussion of the Debtors' cash collateral problems and its issues with RVSI Investors at the beginning of these cases may be found in this Court's memorandum opinion at In re Robotics Vision Sys., Inc., 2006 BNH 033, 2-9.

No credible evidence has been presented that Dreier erred in advising the Debtors to accept the only cash collateral proposal available, namely the one with RVSI Investors.  In fact, Dreier advised the Debtors to find alternate financing and attempted to locate alternate lenders, only to see Costa and the Debtors' management fail to pursue those opportunities.  Dreier also advised the board of directors that absent a resignation by Costa, RVSI Investors would not continue to finance the Debtors.  Costa and the board rejected any resignation by Costa, but ultimately agree to the appointment of Budd as the controlling person to secure RVSI Investors' agreement to an extension of cash collateral usage.  See Debtors' Notice of Consent to Lender's Proposal dated January 19, 2005 (Bk. Doc. No. 365).

The dispute with GSI Lumonics had been ongoing for several years prior to the retention of Dreier.  Although an initial lawsuit had been settled under an agreement pursuant to which the Debtors would make certain payments to GSI Lumonics over time and then own the rights to any disputed patents, the Debtors had ceased making such payments prepetition.  GSI Lumonics then terminated the Debtors' license under the original settlement agreement and filed a second suit against the Debtors.  Before the commencement of this bankruptcy proceeding, the Debtors' management was aware of the demands by RVSI Investors that the SEG division be sold and knew, or should have known, of the adverse impact on its value due to the existence of this dispute and the federal court lawsuit with GSI Lumonics.  In fact, on the eve of the commencement of these proceedings, a federal magistrate judge in New York had issued a report and recommendation that summary judgment be entered in that suit in favor of GSI Lumonics.  Despite the devastating impact of the dispute with GSI Lumonics on the viability and value of the SEG division, the Debtors' management did little prepetition or postpetition to resolve the suit.  This failure appears to be based primarily on Costa's unwavering view of the merits of the

17

Debtors' legal position despite the financial and time problems which were severely restricting the Debtors' options for successfully resolving the dispute through litigation.

The need to pursue a quick sale of the SEG division, in order to buy time to find new financing to take out RVSI Investors and save the ACIM division, made recovery of market value for the SEG division unlikely.  However, the dispute with GSI Lumonics over alleged infringement of patents held by GSI Lumonics in the sale and use of the equipment manufactured by the SEG division virtually guaranteed that any sale of the division before a resolution of the dispute would not be at market value.

Dreier made several attempts to deal with the GSI Lumonics dispute.  First, it filed a motion seeking a determination that the 1998 settlement and license agreement between the Debtors and GSI Lumonics was actually a purchase agreement which was the subject of a bona fide dispute.  Such a declaration would have permitted the Court to authorize a sale of the SEG division free and clear of the GSI Lumonics claim.  The Court ultimately ruled against the Debtors.  See In re Robotic Vision Sys., Inc., 322 B.R. 502 (Bankr. D.N.H. 2005).  Second, Dreier attempted to settle the dispute with GSI Lumonics through payment of $2.5 million, but did not receive any response to the offer.  Finally, Dreier negotiated a price reduction with the successful bidder for the SEG division to compensate the buyer for the risk associated with the GSI Lumonics litigation.  After a reduction of the purchase price from $7.5 to $5.5 million, the sale of the SEG division closed.  This Court finds no evidence or argument which supports a credible claim of malpractice in Dreier's handling of the GSI Lumonics dispute.

Both the cash flow and the GSI Lumonics problems existed before Dreier was retained as bankruptcy counsel.  For the purpose of determining a reasonable fee for Dreier, this Court need not resolve the merits of the Debtors' disputes with RVSI Investors or GSI Lumonics.  It is clear

18

that Dreier found those problems when it was first retained and that any resolution of those problems would have been extremely difficult, if not impossible, due to the bad relationships between the Debtors' management and those parties.  The evidence before the Court in this matter and the Court's presiding over many other hearings in these cases, involving cash collateral, management of the Debtors, and the sale of the Debtors' two operating divisions, lead the Court to the conclusion that Dreier adequately and properly advised and assisted the Debtors in achieving results as favorable as was possible under the circumstances.

### 2.  Fraud Allegations against Dreier

Costa's allegations of fraud against Dreier involve the negotiations and actions leading to the approval of consensual cash collateral orders between the commencement of the cases and January 19, 2005.  Costa makes two basic allegations.  First, Costa alleges that Kinel intentionally misled the Debtors' management regarding the availability of cash under the cash collateral orders in order to obtain the Debtors' consent to the demands of RVSI Investors. Second, Costa alleges that Kinel conspired with Budd to mislead the Debtors' board of directors in connection with the appointment of Budd as controlling person of the Debtors at the time the cash collateral order entered on January 20, 2005 (Bk. Doc. No. 374).

No evidence was introduced to support any claim that Kinel or Dreier intentionally misled Costa or the Debtors' management regarding the terms of any cash collateral agreement with RVSI Investors.  For the reasons discussed in section III.B.1 above, the evidence supports a finding that Kinel and Dreier recognized that at the beginning of these cases the Debtors had no alternative to reaching a consensual cash collateral agreement with RVSI Investors.  The evidence supports a finding that Dreier advised the Debtors that the only way to escape RVSI Investors was to locate an alternate lender, or for Costa to meet the demands of RVSI Investors

19

that he cede control of the sale of the SEG division, or resign as an officer and director of the Debtors. Despite repeated attempts by Dreier to assist the Debtors to pursue one of those alternatives, the Debtors' management and board of directors refused to do so. The Court finds no evidence of any intentional misrepresentation by Dreier to the Debtors regarding cash collateral agreements with RVSI Investors.

As the Court has already noted, the relationship between the Debtors and RVSI Investors regarding the use of cash collateral, and their negotiations with respect to cash collateral, reflected a high degree of mutual mistrust and animosity. On December 21, 2004, the Debtors filed their Second Motion for Order Authorizing Continued Use of Cash Collateral (Bk. Doc. No. 166) (the "Second Cash Collateral Motion"). In that motion the Debtors alleged that despite good faith efforts to work with the lender on the use of cash collateral, the Debtors' ability to conduct their business affairs and reorganize was being impaired by the lender's arbitrary and ever changing requirements to determine the availability of cash collateral, numerous unnecessary audits and visits by professionals hired by the lender to review the Debtors' records, interference with the sale of an operating division through numerous information requests directed to the Debtors and their advisors, and acting in a manner to impermissibly obtain control over the Debtors' business decisions and operations. Before the hearing on the Second Cash Collateral Motion, the Debtors filed a motion seeking to amend the first cash collateral order (Bk. Doc. No. 263) (the "Motion to Amend First Cash Collateral Order"). The Court scheduled a hearing on the Motion to Amend First Cash Collateral Order on an expedited basis before the hearing the Second Cash Collateral Motion. After a contested evidentiary hearing, the Court denied the Motion to Amend First Cash Collateral Order. <u>See</u> Order dated January 19, 2005 (Bk. Doc. No. 357).

Shortly after the entry of that order, the Debtors filed a written notice of consent to the terms of a proposal by the lender to provide for the further use of cash collateral and the continuation of the Debtors' operations (Bk. Doc. No. 365).  After a hearing on the Second Cash Collateral Motion on January 20, 2005, the Debtors stated on the record in open court their agreement to the terms proposed by the lender with minor amendments.  That agreement was incorporated into the terms of a proposed order submitted to and entered by the Court on January 20, 2005 (Bk. Doc. No. 374) (the "Second Cash Collateral Order").  Paragraph 1 of the Second Cash Collateral Order provided:

> Pursuant to Sections 105(a) and 1107(a) of the Bankruptcy Code and Fed.R.Bankr.P. 9001(5), the <u>Debtor hereby irrevocably appoints,</u> and the Court hereby approves the appointment of, <u>Mr. J. Richard Budd as the person in control of the Debtor (the "**Controlling Person**"). The Controlling Person shall have all rights and powers, and shall perform all the functions and duties, of the Debtor as debtor-in-possession,</u> until the date (the "**Payoff Date**") Lender's claims against Debtor, including all interest, fees, costs and other charges allowed or allowable under Section 506(b) of the Bankruptcy Code, are indefeasibly paid in full in cash. <u>All actions taken by the Controlling Person shall be deemed authorized under applicable nonbankruptcy law as if exercised and taken by unanimous action of the Debtor's board of directors and, until the Payoff Date, the rights and obligations of the Debtor's board shall be delegated to the Controlling Person.</u>

(emphasis added).

On January 31, 2005, ten days after the entry of the Second Cash Collateral Order, Costa filed his motion to amend that order (Bk. Doc. No. 453) (the "Motion to Amend").  The Motion to Amend was based upon an allegation by Costa, supported by other directors, that the Second Cash Collateral Order did not reflect the agreement authorized by the board of directors.  Costa alleged:

> The Second Cash Collateral Order was presented to the Court as having been consented to by the Debtors and their senior secured lender, RSVI [sic] Investors, L.L.C.  What was presented to the Court, however, does not reflect the agreement authorized by the Debtors' Board.  Specifically, while the Board consented to the

21

> appointment of J. Richard Budd as the "Controlling Person," it specifically
> conditioned Mr. Budd's appointment upon a five-point plan of action that is not
> reflected in the Second Cash Collateral Order.  The Board only became aware of
> these omissions on January 24, 2005, and it has since learned that Mr. Budd is no
> longer willing to honor his commitment to the Board that its plan of action will be
> pursued.  The Board would not have authorized the Debtors to consent to the
> Second Cash Collateral Order unless the agreement that it made with Mr. Budd
> was memorialized in the document or assurances were given that its agreement
> with Mr. Budd could be enforced through some other mechanism.

Motion to Amend at 1-2.  After notice and a hearing, the Court denied the Motion to Amend

because Costa had failed to establish grounds to alter or amend the Second Cash Collateral

Order.  See Order dated February 15, 2005 (Bk. Doc. No. 581).  Costa now contends that Dreier,

through Kinel, conspired with Budd to fraudulently deceive the Debtors' management and board

of directors regarding consent to Budd's appointment as controlling person.

Costa maintains that Budd agreed with him and the board of directors on a five-point plan

that he would implement after his appointment as controlling person.  Costa contends that three

of the points were deemed critical to the board:  (1) hiring Jaymie Durnan as the president; (2)

terminating Dreier's retention and hiring the firm of Kramer Levin as new bankruptcy counsel;

and (3) retaining Miller Matthis as a financial advisor to the Debtors.  The evidence supports the

fact that each of these three actions were discussed among the Debtors' officers and directors

and with Budd.  However, Budd has denied that he ever agreed to take such actions.  See Decl.

of J. Richard Budd (Bk. Doc. No. 468).  Costa alleges that Budd agreed to implement the five-

point plan during his participation in one or more telephone conferences with the board of

directors on January 19, 2005.  While there is evidence that several directors thought that Budd

participated in one or more of those telephonic conferences, the Trustee presented evidence that

Budd did not participate in any of the telephonic conferences on January 19, 2005.

Despite extensive discovery in connection with his opposition to the fee applications and the Trustee's settlement, and his earlier attempt to have a chapter 11 trustee appointed after Budd was appointed as controlling person, Costa has failed to present any credible testimony which would support a finding that Dreier, through Kinel, conspired with Budd to fraudulently mislead the officers and directors of the Debtors regarding the appointment of a controlling person.  At the hearing on January 20, 2005, Kinel, Budd and Costa, as well as attorney Bruce Harwood, were present when the Court made express statements on the record that under the terms of the proposed order submitted by the parties the Court's interpretation was that Budd would have absolute authority to run the Debtors' operations without the consent or agreement of its officers and directors.  None of them disputed the Court's understanding.  Therefore, if Costa's allegations of an express agreement that consent to Budd's appointment was contingent on his following a five-point plan are true, then Kinel, Budd, Harwood and Costa all committed a fraud on the Court when they failed to disclose such an agreement at the hearing when they represented to the Court that the terms of the draft Second Cash Collateral Order were consensual.  The agreement to appoint Budd as controlling person was made in order to secure not only the agreement of RVSI Investors to continued use of cash collateral, but also to drop its pending motion for appointment of a chapter 11 trustee.  In that context, it is not credible that three bankruptcy professionals, and the CEO of the Debtors, having made an agreement which limited Budd's control only the day before, would stand mute in the face of direct questions from the Court.  No credible evidence to the contrary was presented by Costa.

### 3.  Merits of the Dreier Application

At the time Dreier was first retained, RVSI Investors, the Debtors' sole lender, and Costa and the Debtors' board of directors, were at war with each other.  Dreier provided advice to the

Debtors and was able to secure agreements on the use of cash collateral which permitted the Debtors to remain open, pay their employees, and ultimately sell their operating businesses at a fair value under the circumstances of the cases.  Those circumstances arose from the insistence by RVSI Investors that the Debtors sell their assets as soon as possible because it had lost all confidence in the management of the Debtors.  Dreier did not create or contribute to that loss of confidence.  It advised the Debtors that the only prospect for eliminating the demands of RVSI Investors was to close a new credit facility.  However, the Debtors' management and board of directors never seriously pursued that advice.  Instead they spent critical time seeking replacement counsel for Dreier.  Unfortunately, their conduct was the equivalent of "fiddling while Rome burned."  Resolving the GSI Lumonics dispute and finding a new lender to take out RVSI Investors were the critical actions that needed attention.  The failure of the Debtors' management and board of directors to seriously address those problems both before and after the commencement of these bankruptcy proceedings directly resulted in the need for the appointment of Budd and the problems Costa complains about now.  The Court finds the evidence established that Dreier obtained good, if not excellent, results under such circumstances.

In the Court's view, a reasonable range for Dreier's fees in these cases is between $2,407,742.80 and $3,009,678.55, or between 80 and 100% of the request.  The Court concludes that the results in these cases would not justify any fee enhancement beyond the lodestar amount, or 100% of the requested fees.  While the results were good under the circumstances, the UST originally raised questions regarding the hourly rate and certain expenses.  See footnote 1.  In addition, the Court believes that portions of Dreier's time might not be compensable because excessive time spent on internal policy disputes with management may not have been

productive.  The Court finds, however, the ultimate sale results to be good to excellent so that

any reduction would be minimal.  The Trustee has recommended that Dreier be awarded final

fees of $2,559,678.55, or 85% of the lodestar amount.

Dreier's final request for reimbursement of expenses is $193,540.49.  The Trustee

recommends that Dreier be awarded $102,392.48 in expense reimbursement, but takes no

position on that portion of the expense request representing facsimile charges of $252.90 and

electronic legal research expenses of $90,895.11, which together total $91,148.01.  The Dreier

request for reimbursement for electronic costs cover the entire duration of their time as counsel

for the Debtors.  The total requested for outgoing facsimile charges is minimal and shall be

approved as reasonable and necessary.  The total requested reimbursement for electronic legal

research is substantial.  The Court has reviewed the detailed fee and expense exhibits to the two

interim fee applications and the final fee application submitted by Dreier.  Those applications do

not provide the Court with any breakdown of the issues or project categories for which the legal

research expenses were incurred.  Dreier has the burden of proving that its request for

reimbursement of expenses for electronic legal research are reasonable and necessary.  In re New

Hampshire Elec. Coop., Inc., 146 B.R. 890, 903 (Bankr. D.N.H. 1992; LBR 2016-1 and AO

2016-1.  Accordingly, it is not possible for the Court to determine the necessity or

reasonableness of the individual charges that are included within the total reimbursement

request.  Despite the absence of detail necessary to determine the reasonableness and necessity

of individual legal research charges, or categories of charges, the Court recognizes that this case

did involve significant legal issues and disputes for which some level of legal research was both

necessary and reasonable.  Based upon the issues which were raised and litigated in this case, the

25

Court shall award $45,447.56, or 50% of the requested reimbursement for electronic legal research.

In summary, the Court's range of the final fees and expenses that Dreier would be awarded in these proceedings is:

|  | **High** | **Low** |
|---|---|---|
| Fees | $3,009,678.55 | $2,407,742.80 |
| Expenses | $193,540.49 | $148,092.94 |
| Total | $3,203,219.04 | $2,555,835.70 |

### 4. Trustee's Settlement

Under the Dreier Settlement, Dreier would be paid $2,559,678.55 in fees and $102,392.48 in expenses for a total of $2,662,071.03. Accordingly, the Trustee's settlement falls within the Court's range for a final award of fees and expenses to Dreier in these bankruptcy cases. The testimony by the Trustee established that he investigated the fraud and malpractice claims raised against Dreier and found them to have little or no validity. Costa objects to the Dreier Settlement alleging that the Trustee's investigation was cursory and ignored "voluminous credible evidence" produced by Costa in support of his malpractice and fraud allegations against Dreier.

After nearly three days of testimony and cross examination of the Trustee by Costa, the Court is satisfied with the breadth and extent of the Trustee's investigation. The Trustee testified that his investigation failed to find credible evidence to support the fraud and malpractice claims. He testified that he did not find sufficient evidence to justify the expense and risk to the estate of litigating any such claims against Dreier. After considering the testimony of the Trustee and reviewing the voluminous exhibits submitted in this dispute, the Court finds that the Trustee's

decision is reasonable and supported by the weight of the evidence.  The proposed settlement

falls within the range determined by the Court for a final fee and expense award to Dreier.

Accordingly, the Court finds the Dreier Settlement to be fair and reasonable.

### C.  MGBD Application

In accordance with the terms of the Initial and Amended MGBD Agreements, MGBD

seeks final approval of $1,706,451.00 in fees and $164,026.56 in expenses.  In addition, pursuant

to the indemnity provisions of its court-approved retention agreement, MGBD is also seeking

approval of an administrative expense claim in the amount of $390,115.43 for attorneys' fees

and expenses incurred in opposing Costa's motion to replace it with a chapter 11 trustee.

MGBD has been paid all of the fees and expenses for which it is seeking final approval with the

exception of $12,618.08 in expenses and its administrative expense claim under the

indemnification clause of its retention agreement.

MGBD's retention as crisis manager to the Debtors was approved under § 363 of the

Bankruptcy Code (Bk. Doc. Nos. 39 and 1343 at 65-66).  Under the terms of the retention

agreement approved by the Court, MGBD was paid a flat fee in the amount of $100,000.00 for

the period November 19, 2004 through December 15, 2004.  Thereafter, MGBD was paid a flat

fee in the amount of $150,000.00 per month (Bk. Doc. No. 33, Ex. A).  In addition, MGBD was

to be reimbursed its actual costs for travel, lodging, meals and other expenses directly relating to

the performance of services for the Debtors.  As of the appointment of Budd as controlling

person on January 20, 2005, the Court approved an amended retention agreement increasing the

monthly compensation to $200,000.00 (Bk. Doc. No. 827).  After the sale of the SEG division,

MGBD voluntarily reduced its monthly compensation to $150,000.00.  After appointment of the

Trustee on October 11, 2005, MGBD resigned as manager and controlling person of the Debtors.

From the November 19, 2004 through January 19, 2005, Budd served as Chief Restructuring Officer for the Debtors and another MGBD employee, Frederick Van Alstyne, served as Chief Financial Officer.[10]  As a result, MGBD was involved in all aspects of the day-to-day operations of the Debtors including organization, human resources, marketing, sales, logistics, finance, administration, and oversight of the bankruptcy process including preparing and filing bankruptcy schedules, the statement of financial affairs, and required reports.  On January 20, 2005, Budd was appointed as controlling person.  He continued to serve as the Debtors' Chief Restructuring Officer.  Van Alstyne was named the Debtors' Acting President as well as the Chief Financial Officer.

MGBD contends that because its retention was authorized by the Court under § 363 of the Bankruptcy Code, review of its compensation is "limited to an inquiry as to whether the compensation paid to MGBD was contemplated by and conformed to the Initial MGBD Agreement and the Amended Management Agreement."  See MGBD Application ¶ 40 (Bk. Doc. No. 1503).  MGBD contends that there is no basis to adjust its fees because no party raised any question regarding the amount of the fees and expenses during the course of the cases and MGBD performed all the services contemplated by the retention orders.  Id.  Costa's objection to the MGBD Application is not based upon the amount of compensation or any failure to have performed services contemplated, but rather is based upon allegations of fraud and a conflict of interest in performing such services.  Section 328(a) of the Bankruptcy Code provides that notwithstanding approval of the terms and conditions for compensation when employment is authorized under § 327, "the court may allow compensation different from the compensation

---

[10]  MGBD had been retained by the Debtors shortly before the filing of their chapter 11 bankruptcy petitions on November 19, 2004.  However, the fee application only deals with MGBD's services from the petition date through the conversion of the cases to chapter 7 on October 11, 2005.

provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."  11 U.S.C. § 328(a).  MGBD contends that § 328 does not apply to the Court's review of the MGBD Application because its retention was approved under § 363 rather than § 327.  Without deciding whether MGBD is correct in its assertion, the Court shall review the MGBD Application under the more restrictive standard of § 328.

### 1.  Conflict of Interest Allegations against MGBD

Costa contends that when MGBD was initially retained by the Debtors, and when it filed an affidavit in support of its retention by the Court, it failed to disclose to the Debtors and the Court that it had a conflict in interest.  The alleged conflict of interest arose out of MGBD's involvement with Samuel Zell in the ACL Case pending in Indiana.  Employees of MGBD were retained as the interim chief financial officer and restructuring officer of American Commercial Lines, LLC ("ACL"), the debtor in the ACL Case.  Costa alleges that MGBD never disclosed that ACL was an affiliate of Danielson Holdings Corp., that Zell as Chairman and CEO of Danielson Holdings Corp. exercised control over ACL because Danielson was the 100% shareholder of ACL, and that Zell and his affiliates owned 42% of ACL's outstanding bonds.  Costa contends that MGBD's involvement in the ACL Case was a conflict of interest in these cases because RVSI Investors, the Debtors' sole prepetition and postpetition lender, was an entity allegedly controlled by Zell.

In its original retention application, MGBD disclosed that it had previously served as interim chief financial officer and restructuring officer for EGI-Fund (02-04) Investors, LLC ("EGI"), a secured bondholder of the Debtors.  Despite this disclosure, Costa did not oppose,

29

and, in fact, supported the retention of MGBD in these cases.  On December 14, 2004, prior to

the final hearing on its retention, MGBD filed a supplementary schedule to the declaration of

Budd submitted with the original application (Bk. Doc. No. 121), which was admitted as Exhibit

87 at the hearing.  In the supplementary schedule, MGBD disclosed that RVSI Investors and

HYI Investments, LLC ("HYI") are affiliates of EGI, that RVSI Investors asserted a secured

claim against the Debtors, that MGBD was retained as chief financial officer and restructuring

officer in the ACL Case, that HYI was a secured bondholder of ACL, and that ACL was owned

by Danielson Holdings Corp., another affiliate of EGI.

Costa's allegations that MGBD failed to adequately disclose its relationships with entities

owned or controlled by Zell to the Debtors is refuted by the record in these cases.  On November

21, 2004, the Affidavit of Pat V. Costa in Support of First Day Motions and Applications (Bk.

Doc. No. 14) (the "Costa Affidavit") was filed with the Court.  In the Costa Affidavit, Costa, in a

sworn statement, states EGI held a majority ownership in RVSI Investors, was its managing

partner, and was a private investment firm "led by financier Sam Zell."  Costa Affidavit ¶¶ 17-18

and n.9.  Accordingly, Costa understood that MGBD's involvement in the ACL Case involved

entities owned, controlled, or affiliated with Zell.  Despite this knowledge, Costa raised no

objection to the retention of MGBD at the beginning of the cases, or even in March 2005 when

the terms of MGBD's retention were modified by the Court.  Only after MGBD's services to the

Debtors in these cases were concluded and the final fee application was filed did Costa, for the

first time, articulate his conflict of interest allegations.

The Trustee testified that the first time the conflict of interest allegations were articulated

to him by Costa was in November 2006.  See Tr. of Jan. 29, 2007 Hr'g, Vol. II, at 184-87 (Adv.

No. 06-1157-JMD Doc. No. 135).  In fact, after Budd was appointed as the controlling person,

and Costa's relationship with MGBD became publicly hostile, he did not raise conflict of interest issues with the Court.  He only raised the fraud claims associated with the board's decision to consent to Budd's appointment.  See Motion to Amend (Bk. Doc. No. 453).  The Court finds that MGBD's disclosures to the Court, Costa, and the Debtors were adequate.  The Court is satisfied that Costa knew, or should have known, of MGBD's involvement in the ACL Case and failed to raise any issue with MGBD or the Court in a timely manner.  The testimony of the Trustee established that his inquiries into MGBD's role in the ACL Case revealed that MGBD acted independently of Zell, under the supervision of an independent creditors committee, and that MGBD "played it straight."  See Tr. of Dec. 4, 2006 Hr'g, Vol. II, at 200-04 (Adv. No. 06-1158-JMD Doc. No. 131).  In fact, the Trustee learned that Zell initially opposed MGBD's involvement in the ACL Case, but after MGBD sold a division of ACL and was able to provide a dividend for unsecured claims, Zell no longer opposed them.

Costa also contends that MGBD intentionally offered for sale and sold the SEG and ACIM divisions of the Debtors for fire sale values as part of a scheme to enable Zell to gain control or ownership of the Debtors' business.  The allegations are completely without merit.  The timing of the sale of the Debtors' two operating divisions was due to the terms of cash collateral orders negotiated by the Debtors and approved by this Court.  As discussed in section III.B.1 above, the dispute with GSI Lumonics was the primary factor in depressing the value and ultimate sale price of the SEG division.  The GSI Lumonics dispute began and escalated on Costa's watch, before MGBD was ever retained.  The Court is satisfied that MGBD and Dreier attempted to resolve or minimize the impact of that dispute to the best of their ability.  The ACIM division was sold for sufficient funds to pay the secured claim of RVSI Investors and provide some cash for the bankruptcy estate.  It was sold with the assistance of an investment

31

banker under court supervision.  The Court is satisfied that fair value was obtained in that sale.
MGBD was able to keep the ACIM division operational under difficult cash flow and employee
morale constraints which contributed significantly to the price obtained at the sale.  The Court
finds that MGBD managed the Debtors' business operations well under difficult circumstances
and contributed to the sale of the Debtors' two operating divisions at the best values obtainable
under the circumstances.

### 2.  Fraud Allegations against MGBD

Costa alleges that MGBD, through Budd, fraudulently induced the board of directors of
the Debtors to consent to Budd's appointment as controlling person.  Costa's claims have
changed during the course of this dispute.  Costa initially alleged that Budd agreed with Costa
and the Debtors' board of directors on a so-called five-point plan in order to secure their
agreement and consent to his appointment by the Court as controlling person when he had no
intention to carry out any of those points.  See Motion to Amend (Bk. Doc. No. 453).  When
evidence supporting those allegations was not forthcoming, Costa's claims changed into
allegations that Budd lied to the Court in an affidavit regarding his participation by telephone in
a board of directors' meeting on January 19, 2005, and the agreement he made with Costa during
a private telephone call during the board meeting.  Id.; Decl. of J. Richard Budd (Bk. Doc. No.
468).

Over three days of testimony, Costa failed to produce any substantial evidence of the
existence of an agreement by Budd.  Costa's fraud allegations have been in the record of these
cases since shortly after Budd's appointment in January 2005.  See Motion to Amend (Bk. Doc.
No. 453).  Prior to commencement of these adversary proceedings, Costa conducted extensive
discovery in connection with a motion he filed to remove Budd and appoint a chapter 11 trustee.

32

See Motion of Pat V. Cost for the Appointment of a Chapter 11 Trustee (Bk. Doc. No. 961);

Order dated June 3, 2005 (Bk. Doc. No. 1076); Order dated July 11, 2005 (Bk. Doc. No. 1180);

Tr. of July 8, 2005 Hr'g (Bk. Doc. No. 1187); Discovery Status Report as Requested in the

Court's July 27, 2005 Order (Bk. Doc. No. 1217); Order dated August 3, 2005 (Bk. Doc. No.

1225).  The Trustee testified at the evidentiary hearing that, shortly after his appointment, Costa

and his counsel provided the Trustee with voluminous materials developed by Costa through his

efforts and through the discovery previously conducted to support his fraud allegations against

Budd.  The Trustee testified that he had extensive meetings with Costa and his counsel regarding

the events surrounding the January 19, 2005 board meeting and the appointment of Budd as

controlling person on January 20, 2005.  Tr. of Dec. 5, 2006 Hr'g, Vol. II, at 229-30 (Adv. No.

06-1158-JMD Doc. No. 132).  The Trustee estimated that "a million dollars were spent turning

over every single rock on every second of every minute of this January 19th and 18th time

period."  Id. at 229.  Exhibit 92 admitted into evidence at the hearing contained a total of fifty-

three separate documents, consisting of transcripts of ten depositions, numerous e-mails and

telephone records, all developed in connection with the discovery authorized in connection with

Costa's motion for the appointment of a chapter 11 trustee in the summer of 2005.  The Trustee

testified that Exhibit 92 was a copy of the materials provided to him by Costa's counsel in

support of his claim of fraud against Budd.  Tr. of Dec. 4, 2006 Hr'g, Vol. I, at 88-91 (Adv. No.

06-1158-JMD Doc. No. 131).

After reviewing Exhibit 92, the Court finds that the documents contained in Exhibit 92

establish that the elements of the so-called five-point plan were discussed, to some extent, at or

around the January 19, 2005 board meeting.  However, the Court finds that Exhibit 92 does not

establish that Budd made any express agreement with the board regarding the five-point plan.

The Trustee testified that his investigation revealed insufficient evidence to support a conclusion that Budd had agreed to any such plan.  Tr. of Dec. 4, 2006 Hr'g, Vol. II, at 194-95 (Adv. No. 06-1158-JMD Doc. No. 131).  The Trustee placed great weight on the fact that none of the bankruptcy professionals, including the attorney Costa wanted to hire to replace Dreier (one of the points in the five-point plan), testified in their depositions that an agreement was made.  Id. at 183-88; Ex. 94 at 105-15.  The Court concurs with the Trustee's analysis.

Costa contends that Budd agreed to implement the board's five-point plan during a telephone call with either Costa or the board during the evening of January 19, 2005.  The depositions of Costa and the other directors reflect testimony that Budd was on one or both of the conference calls with the board beginning around 5:54 p.m. and 6:20 p.m. on January 19, 2005.  However, the undisputed testimony of the Trustee was that he reviewed all telephone records for the conference call, as well as Budd's cell phone records, and found no evidence that Budd participated in the call.  Tr. of Jan. 29, 2007 Hr'g, Vol. II, at 177-84 (Adv. No. 06-1157-JMD Doc. No. 135); Ex. 104 and 335.  Neither Costa, nor any other officer or director of the Debtors, testified, or was subject to cross examination, at the evidentiary hearing on the Trustee's settlements.  The Court found the Trustee's investigation to be thorough and his testimony to be credible.  The conflicting deposition testimony was at worst vague or at best based upon what various deponents thought was happening or were told by Costa had happened.  Although he was present throughout the evidentiary hearing on the Trustee's settlements, Costa did not testify.  Accordingly, Costa has failed to establish that Budd participated in any conference calls with the board of directors on January 19, 2005.

### 3.   Merits of the MGBD Application

During the time it was retained, MGBD dealt with numerous difficult and disputed

matters.  Those matters included negotiating several cash collateral agreements despite an

acrimonious relationship between the Debtors and RVSI Investors, preparing and filing required

bankruptcy documents, communicating with the Debtors' vendors and customers, managing

relationships between employees and senior management of the Debtors, preparing and filing a

Form 8k, negotiating with the creditors committee, advising and assisting the Debtors'

bankruptcy counsel, assisting in the sale and marketing of the Debtors' two operating divisions,

and assisting the Trustee in determining administrative expenses and analysis of claims.  No

credible objection to the quality, timeliness, or adequacy of the performance of services has been

presented to the Court.  It has been the Court's observation during the course of many hearings

in the contentious chapter 11 portion of these cases that the employees of MGBD satisfied their

responsibility to support the Debtors and their counsel in those proceedings.

MGBD was retained on a flat monthly fee (plus expenses) basis, the amount of which

varied from time to time with approval by the Court.  No objection has been made to the

calculation of the fees previously paid to MGBD, namely the final fee request of $1,706,451.00.

No objections were raised as to the reasonableness of the monthly fee, as amended from time to

time.  The monthly fees were reasonable when they were approved and modified.  The Court

finds that there have been no developments in these cases since approval of the monthly fees that

would suggest that the amount of such fees was improvident in hindsight.  In fact, since the

original terms and conditions of the compensation of MGBD were determined at the beginning

of these cases, developments arose that resulted in these cases being more complex and difficult

than the Court anticipated.  Accordingly, the Court finds no grounds to review the terms and

conditions of MGBD's retention under § 328(a) of the Bankruptcy Code or to allow the MGBD Application in any amount other than the full amount requested.

### 4. Trustee's Settlement

The MGBD Settlement consists of two principal parts.  First, the MGBD Application for fees and expenses would be allowed in full.  Second, the MGBD Administrative Claim in the amount of $390,115.43 would be dismissed with prejudice and, upon entry of a final non-appealable order approving the settlement agreement, MGBD would pay the Trustee the sum of $10,000.00.  As discussed in section III.C.3 above, no objections to the quality, timeliness or adequacy of the fees and expenses incurred by MGBD under the terms of its court-approved retention have been raised, and the Court finds that no grounds exist which would require a review of such fees and expenses under § 328(a), if applicable.  The only objection to the MGBD Application are the fraud and conflict of interest allegations raised by Costa.  For the reasons discussed in sections III.B.2 and III.C.2 above, the Court finds that Costa has failed to establish that MGBD committed any fraud or malpractice, either alone or in conjunction with Dreier.  Accordingly, the first part of the Trustee's settlement with MGBD is within the range of likely results with respect to the MGBD Application.

The second part of the Trustee's settlement, the waiver of the indemnification claim, depends on the likelihood of success by MGBD in pursuing a claim under the indemnification provisions of its court-approved retention agreement.  Under the terms of the Second Cash Collateral Order, MGBD remained as the Debtors' manager and Budd was appointed as controlling person.  In connection with Budd's appointment, MGBD entered into the Amended MGBD Agreement with the Debtors as of January 20, 2005.  Section 7(b) of that agreement provided:

Debtors shall indemnify [MGBD], Budd, Van Alstyne and each of [MGBD's] other employees, agents and managers to the fullest extent permitted under the Debtor[s'] certificates of incorporation and by-laws and applicable law in connection with any threatened, pending or completed action, suit or proceeding, whether criminal or civil, by reason of the fact that such person is or was an officer, employee, consultant or agent of the Debtors (each, an "Indemnitee"). Without limiting the extent of the foregoing or any rights available under the Debtors' certificates of incorporation or by-laws or applicable law, the Debtors[] will advance any expenses incurred by such Indemnitee in defending any such action, suit or proceeding. The Debtors' obligation to make any such indemnification payments and advance of expenses to an Indemnitee shall be treated and paid as an administrative expense claim pursuant to Sections 507(a)(1)(A) and 503(b) of the United States Bankruptcy Code.

(Bk. Doc. No. 709) (the "Indemnification Agreement"). In the MGBD Administrative Claim, MGBD seeks an administrative expense claim under the Indemnification Agreement in the amount of $390,115.43 for legal fees and expenses through October 11, 2005.

On March 14, 2005, the Court entered an order approving the Amended MGBD Agreement and the Indemnification Agreement nunc pro tunc to February 28, 2005 (Bk. Doc. No. 827). Section 7 of the Initial MGBD Agreement did not include any indemnification provision, but did include a requirement that the Debtors add Budd and Van Alstyne to its existing directors and officers insurance policy (the "D&O Policy"). However, the term of the Debtors' D&O Policy expired on February 28, 2005, and the Debtors could not afford to renew the policy. Accordingly, the Initial MGBD Agreement was amended to provide for the Indemnification Agreement as a substitute for the expired D&O Policy.

On April 28, 2005, Costa filed a motion seeking appointment of a chapter 11 trustee (Bk. Doc. No. 961) (the "Costa Trustee Motion"). In the Costa Trustee Motion, Costa alleged that Budd had filed false declarations with the Court, fraudulently obtained his appointment as controlling person, and grossly mismanaged the previously approved sale of the SEG division. MGBD and Budd retained independent counsel due to the allegations of fraud, gross

37

mismanagement, and filing false affidavits.  Pursuant to a court-approved discovery order, extensive documents were produced and depositions taken during the summer of 2005.  On September 27, 2005, the Court approved the sale of the Debtors' remaining business operations, the ACIM division.  On October 11, 2005, the Court held a hearing on a motion by the Official Committee of Unsecured Creditors to convert the cases to chapter 7.  At the conclusion of the hearing, the Court entered an order converting the cases to chapter 7 and dismissing the Costa Trustee Motion as moot (Bk. Doc. No. 1441).

MGBD contends that the legal expenses incurred in defending itself and Budd from the allegations in the Costa Trustee Motion constitute an administrative expense claim under the Indemnification Agreement for two reasons.  First, the Debtors' certificate of incorporation provide for indemnification of officers to the full extent permitted by section 145 of the Delaware General Corporation Law, which provides for indemnification of a corporate officer who is or was a party to any proceeding by virtue of acting in good faith and in the best interests of the corporation.  Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.), 323 B.R. 345, 367 (Bankr. S.D.N.Y. 2005) (indemnification under section 145 is obligatory where a corporation's by-laws provide for indemnification to the extent permitted by law).  Second, the dismissal of the Costa Trustee Motion as moot satisfies the requirement of Delaware law that an officer seeking indemnification successfully resolve the action or proceeding on the merits.  MGBD contends that the dismissal of the Costa Trustee Motion as moot amounts to success on the merits under Delaware law.  Waltuch v. Conticommodity Servs., Inc., 88 F.3d 87, 96-97 (2d Cir. 1996) (dismissal with prejudice of private suits after payment of a settlement by the corporation in a related suit was a resolution on the merits entitling the officer to indemnification under Delaware law).

38

Costa contends that MGBD is not entitled to any claim for indemnification because the fraud allegations against Budd preclude any argument that he was acting in good faith, and the conduct alleged by Costa occurred before Budd was appointed as controlling person and before February 28, 2005, the effective date of the Indemnification Agreement.  Costa does not dispute the reasonableness of the fees incurred by MGBD.

The Court need not resolve the legal issues raised in Costa's objection.  It is clear that the Costa Trustee Motion was dismissed as moot.  However, Costa raised the same issues regarding the conduct of Budd and MGBD in his objections to the MGBD Administrative Claim and the MGBD Settlement.  As discussed above, he has failed to submit sufficient evidence to prove his allegations of fraud and mismanagement.  In addition, there is no credible argument that the allegations in the Costa Trustee Motion against Budd and MGBD did not concern their serving as an "officer, employee, consultant or agent of the Debtors" under the terms of the Indemnification Agreement or that the Indemnification Agreement was not intended to provide protection after the expiration of the Debtors' D&O Policy.  Accordingly, it appears likely that some or all of the MGBD Administrative Claim is covered by the Indemnification Agreement.  In the absence of any challenge to the reasonableness of the fees and expenses which comprise the MGBD Administrative Claim, the Court concludes that MGBD would likely prevail in establishing an administrative claim under the Indemnification Agreement for a significant sum.  The range of likely recovery need not be determined because the Trustee's settlement eliminates the claim in its entirety.

The combined total of the MGBD Application for fees and expenses and the MGBD Administrative Claim is $2,260,592.99.  The MGBD Settlement would result in a net payment to MGBD of $1,860,477.56, or 82.3% of its total claim.  The proposed settlement of the MGBD

claims falls slightly under the amount of the MGBD Application and is approximately $400,000.00 less than the total requested.  The settlement is within the range of likely outcomes of their total fee and expense requests.  Therefore, the Court finds the MGBD Settlement to be fair and reasonable.

## IV.  CONCLUSION

For the reasons set forth above, the Court will enter separate orders approving the Dreier Settlement and the MGBD Settlement.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will also issue separate judgments consistent with this opinion.

ENTERED at Manchester, New Hampshire.


Date:   June 12, 2009                    /s/ J. Michael Deasy
                                         J. Michael Deasy
                                         Bankruptcy Judge